## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| W.R. and her son, A.R., by and through his mother, W.R.;<br><br>       Plaintiffs<br><br>       v.<br><br>JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); KIRSTJEN NIELSEN, Secretary of DHS; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); THOMAS HOMAN, Acting Director of ICE; PATRICK CONTRERAS, Director, ICE Field Office for Enforcement Removal Operations in Houston, Texas; U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); KEVIN K. MCALEENAN, Acting Commissioner of CBP; U.S. CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS"); L. FRANCIS CISSNA, Director of USCIS; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"); ALEX AZAR, Secretary of the Department of Health and Human Services; OFFICE OF REFUGEE RESETTLEMENT ("ORR"); SCOTT LLOYD, Director of the Office of Refugee Resettlement; BCFS; KEVIN DINNIN, President and CEO of BCFS; and PEDRO MARTINEZ, Administrator on Duty BCFS Baytown.<br><br>       Defendants. | Civil Action No. <u>18-cv-11380</u> |

## COMPLAINT

## INTRODUCTION

1.      Plaintiff W.R. is an asylum-seeker whose nine-year old son, A.R., was forcibly separated from her for no legitimate reason by the United States government.  Upon information and belief, she is one of reportedly thousands of parents who have recently been forcibly separated from their minor children after entering the United States.  W.R. has been attempting to secure the release of her son, A.R. to her but the government has refused to release A.R. from the facility where he is being detained.  The government has provided no legitimate reason for the continued detention of A.R.  W.R. is deeply distressed and fears for the well-being of her child who she has not seen for approximately 30 days.  W.R. asks this Court for an order requiring the government to immediately release her son, A.R., to her custody and care.

2.      On May 28, 2018, W.R. arrived in the United States from Brazil with A.R. seeking to escape years of abuse and threats by her husband and members of his family.  W.R. voluntarily surrendered herself and A.R. to a U.S. Customs and Border Protection ("CBP") officer on patrol.  When asked by the officer why she had come to the United States, W.R. explained as best she could given the officer's inability to communicate in Portuguese that she had fled Brazil in fear for her and A.R.'s life.  During the entire time W.R. was detained, no other immigration authorities asked W.R. why she had come to the United States.

3.      Following their surrender to the CBP officer, W.R. and A.R. were detained in a facility in Arizona.  Immediately following their arrival at the CBP facility, the federal government forcibly separated W.R. and A.R., detaining them in separate cages.  W.R. could see A.R. in a cage, with other children of all ages.  She could see that he was upset, scared, and crying.

4.      On May 30, 2018, W.R. saw an officer enter the cage where A.R. was being held and remove A.R. along with a number of other children.  W.R. screamed and cried but no one came to assist or explain why they were taking A.R. from the cage.  Later, W.R. was informed that

A.R. was being moved to another location; despite her objection, A.R. was moved.  W.R. was not informed why or where A.R. was being taken.  Upon information and belief, A.R. was transferred to the custody of the Department of Health and Human Services ("HHS") to a facility in Baytown, Texas operated by an organization called BCFS.

5.     On June 20, 2018, W.R. was released from custody.  She currently resides with her brother and his family in Massachusetts.

6.     W.R. has not seen her son since May 30, 2018.  Over the past several weeks, W.R. has only been able to communicate with her son by telephone occasionally, and only for 3-5 minutes at a time.  During these phone calls, A.R. has not been permitted to tell his mother where he is located or provide any substantive information to her. When A.R. begins to share any information with his mother, the phone is taken from him.  W.R. is concerned that her son is not being allowed to share the conditions of his confinement with her.

7.     With the assistance of counsel, W.R. has undertaken every effort to have her son returned to her.  Upon her release from detention, W.R. immediately began to try to ascertain A.R.'s whereabouts, but she was given no information about her son and was only provided with a phone number she could call to try to get in touch with her son.  With the assistance of counsel, W.R. researched phone number area codes, which led her to believe that A.R. had been physically transferred and moved to Texas.  It was not until June 27, 2018, nearly 30 days after her son was forcibly separated from her, that W.R. finally was able to determine that A.R. was being held in a facility operated by Defendant BCFS in Baytown, Texas under the purported authority of Defendant Office of Refugee Resettlement ("ORR"), a component of HHS.

8.     On June 25, 2018, W.R. was instructed to fill out and submit a "Family Reunification Packet," identifying herself as the "sponsor" for A.R.  W.R. promptly completed

and submitted 46 pages of materials that same day.  On June 27, 2018, a BCFS case worker conducted a telephone "interview" with W.R.  The case worker referred to W.R.—the mother of the child at issue in this case—as a "sponsor."  On this call, W.R. was told that, due to recently amended ORR rules, she and her two adult household members would need to visit a designated location in Massachusetts to be fingerprinted in order to complete her Family Reunification papers.  She was told that after the fingerprints were submitted (along with other identifying information), ORR would require additional time of at least 3-5 business days and possibly 20 days – just to *evaluate* her sponsor application.  On June 28, 2018, W.R. received a call from a different BCFS case worker, who informed her that the earliest date she and her family members could be fingerprinted is July 12, 2018.

9.     Accordingly, under the government's timeline, W.R. cannot be reunited with her son until, at the earliest, late July 2018—nearly two months since their forcible separation.

10.     This delay is unacceptable, unnecessary, and unconstitutional.

11.     The government's baseless refusal to immediately release A.R. to W.R.'s custody constitutes a fundamental violation of the Fifth Amendment due process rights of W.R. and her son.

12.     This court is empowered to issue a writ of mandamus requiring the relevant government officials to ensure the immediate release of W.R.'s son.

13.     Finally, the government's actions in this case violate both the Administrative Procedures Act ("APA"), and the settlement agreement in *Flores v. Sessions*, 85-cv-4544 (C.D. Cal.).

14.     W.R. came to the United States with her young son seeking asylum and immigration protection.  At no point during her detention did immigration authorities conduct a

"credible fear interview" with W.R., despite the fact that she informed a CBP agent that she feared imminent death if she returned to Brazil.  The federal government forcibly separated her from her son and has kept them apart for nearly one month.  An Executive Order issued on June 20, 2018 purporting to secure family reunification, but parents, like W.R., who have already waited far too long to be reunited with their minor children, have obtained no relief and have been given no clear assurance that they will be reunited with their children.  For these reasons, and the reasons set forth below, the Court should enter an order requiring Defendants to immediately release W.R.'s son into her custody and providing any other relief that is just and proper.

15.    As soon as practicable, W.R. and her undersigned counsel intend to file a motion seeking emergency relief to have W.R. immediately reunited with her child.

## JURISDICTION

16.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), the federal Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), the Fifth Amendment to the United States Constitution, 28 U.S.C. § 2241 (habeas jurisdiction), 28 U.S.C. § 1361 (mandamus jurisdiction), 28 U.S.C. § 1346 (United States as defendant), Art. I, § 9, cl. 2 of the United States Constitution ("Suspension Clause"), the Administrative Procedures Act (5 U.S.C. § 704), and ¶ 24(B) of the *Flores* settlement agreement. Plaintiff A.R. is in custody for purposes of habeas jurisdiction.

## VENUE

17.    Venue is proper under 28 U.S.C. § 1391(e)(1) because plaintiff W.R. resides in Malden, Massachusetts.  Venue is further proper because Plaintiff A.R. will reside with his mother in Massachusetts upon his release.

## PARTIES

18.    Plaintiff W.R. is a citizen of Brazil.  She is the mother of Plaintiff A.R.

19.     Plaintiff A.R. is a citizen of Brazil.  He brings suit by and through his mother, W.R.

20.     Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States ("Attorney General").  In this capacity, he has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of Plaintiff A.R.

21.     Defendant U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States.

22.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the Department of Homeland Security.  In this capacity, she directs each of the component agencies within DHS. As a result, Defendant Nielsen has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, is empowered to grant asylum or other relief, and is a legal custodian of Plaintiff A.R.

23.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

24.     Defendant Thomas Homan is sued in his official capacity as the Acting Director of ICE, and is a legal custodian of Plaintiff A.R.

25.     Defendant Patrick Contreras is sued in his official capacity as the Director of the ICE Field Office for Enforcement Removal Operations in Houston, Texas, and is a legal custodian of Plaintiff A.R.

26.     Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border.

27.     Defendant Kevin K. McAleenan is sued in his official capacity as the Acting Commissioner of CBP.

28.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is the Sub-agency of DHS that, through its Asylum Officers, conducts interviews of certain individuals apprehended at the border to determine whether they have a credible fear of persecution in their home countries and should be permitted to apply for asylum.

29.     Defendant L. Francis Cissna is sued in his official capacity as the Director of USCIS.

30.     Defendant U.S. Department of Health and Human Services ("HHS") is a department of the executive branch of the U.S. government which has been delegated with authority over "unaccompanied" noncitizen children.

31.     Defendant Alex Azar is sued in his official capacity as the Secretary of the HHS.

32.     Defendant Office of Refugee Resettlement ("ORR") is the component of HHS which provides care of and placement for "unaccompanied" noncitizen children.

33.     Defendant Scott Lloyd is sued in his official capacity as the Director of ORR.

34.     Defendant BCFS is the entity operating the shelter in Baytown, Texas, a contracted ORR facility that currently has physical custody of Plaintiff A.R.

35.     Defendant Kevin Dinnin is sued in his official capacity as President and CEO of BCFS.

36.     Defendant Pedro Martinez is sued in his official capacity as the Administrator on Duty of BCFS Health and Human Services-Baytown shelter in Baytown, Texas, the contracted ORR facility that currently has physical custody of Plaintiff A.R

## FACTS

37.     On or about May 23, 2018, W.R. and her nine-year-old son, A.R., fled their home country of Brazil to escape an immediate threat to their physical well-being.

38.     On or about May 28, 2018, W.R. and her son arrived in or around Yuma, Arizona (a town on the U.S.-Mexico border) and presented themselves to immigration authorities.  W.R. spoke to a CBP agent on patrol, who initially spoke to her in Spanish.  W.R. told the agent she did not understand and explained that she spoke Portuguese.  The agent then used Google translate on his cell phone in an attempt to translate text to Portuguese.  Eventually, W.R. understood the agent to be asking her why she came to the United States.  W.R. answered that she fled Brazil in fear for her life and her son's life and was afraid of dying if she returned to Brazil.

39.     The CBP agent then asked W.R. to fill out and sign paperwork which she did not understand.  The CBP agent confiscated W.R.'s money, identification, and belongings.

40.     Despite W.R.'s statement to the CBP agent regarding the reason for her entry into the United States, immigration authorities failed to refer W.R. for an initial screening before an asylum officer, called a "credible fear interview."  *See* U.S. Citizenship and Immigration Services, Questions & Answers: Credible Fear Screening (available at https://www.uscis.gov/humanitarian/refugees-asylum/asylum/questions-answers-credible-fear-screening).   With the exception of her initial contact with the CBP agent, no immigration authorities asked W.R. why she had come to the United States, during her entire time in federal custody.

41.     After presenting themselves to the CBP agent, W.R. and A.R. were loaded into a truck and taken to a facility, where W.R. was fingerprinted and photographed.

42.     Immediately thereafter, A.R. and W.R. were forcibly separated.  As one agent led W.R. to a cage, another agent removed A.R.'s hand from hers and took him in a separate direction.

As this occurred, A.R. was crying and calling out for W.R., and W.R. was shocked, confused, and did not understand why her son was being taken from her.

43.     For two days, W.R. and A.R. were housed in separate cages at the same facility.  If W.R. walked to one end of her cage, and A.R. did the same, W.R. could see him from afar.  W.R. could see that A.R. was frightened, crying, and very upset.  W.R. could see that A.R. was housed in a cage with other children of various ages some appearing as young as two or three, which had a cement floor, and did not have beds or mattresses.  Temperatures were cold in their cages, and W.R. feared for her son's well-being.  W.R. felt helpless listening to her son scream for her and being unable to get to him.

44.     On or about May 30, 2018, W.R. observed someone in a uniform that she did not recognize enter the children's' cell and remove some of the children.  A.R. was among those removed from the cell.  When W.R. saw this she began pounding on the door of her cell and screaming for help, but no agents responded to her cries.  W.R. was terrified regarding what was happening to her son.

45.     W.R. was later informed that A.R. was being transferred to another location.  W.R. objected, but was told he would be transferred over her objection.  W.R. was told not to worry because as soon as she was released she would be able to retrieve A.R.  W.R. was permitted to give A.R. a hug goodbye from her cell.  This is the last time W.R. saw A.R.

**A.     The Government Denied W.R. Information Regarding Her Son.**

46.     W.R. was detained in Arizona for approximately ten days.  W.R. was subsequently transferred to two other facilities, the locations of which she did not know.  On or around June 8, 2018, W.R. was transferred to a detention center in Eloy, Arizona.

47.     During her detention, W.R. repeatedly asked about A.R.'s whereabouts and well-being but was not provided any information.  During this time, she was devastated, desperate, and extremely distressed.  She feared for her son's well-being and she did not know if she would ever see her son again.

48.     On or about June 9, 2018, W.R. learned for the first time that she could submit a "Detainee Request Form" to request information about A.R.  W.R. immediately submitted this form.  In response, W.R. was given a phone number to call to reach her son, but was told she could not call it until June 13, 2018.  She was never provided with her son's immigration case number (A number).

49.     After a number of unsuccessful attempts to reach A.R., W.R. finally spoke to A.R. via telephone on or about June 19, 2018 – nearly three weeks after their separation.

50.     W.R.'s family posted a $7,500 bond to have her released.  Based upon what she had been previously told, W.R. believed that A.R. would then be released to her.

51.     On June 20, 2018, she was released from custody and dropped off at a bus station near Eloy, Arizona.  W.R. then flew to Boston, Massachusetts, where she was met by family members.

52.     Before leaving Arizona, and when she reached Massachusetts, W.R. continued to try the telephone number provided to her to reach A.R.  On some occasions, she has been able to get through to A.R., but on others she has not been permitted to speak to him.  Her conversations with A.R. are limited to 3-5 minutes.  A.R.'s phone conversations are monitored, and A.R. is not permitted to tell W.R. where he is located or how he traveled there.

53.     W.R. used the internet to research the area codes in the phone numbers she had been given.  Through this research, W.R. developed the belief that A.R. had been moved from

Arizona to Texas and was currently being housed in Texas.  W.R. asked staff who answered the phone number she called to confirm A.R.'s location in Texas, but the staff members refused.

54.     On June 25, 2018, W.R. spoke with a BCFS case manager at the facility where A.R. is being held.  The case manager told W.R. that she would need to fill out and submit a "Family Reunification Packet" to secure her son's release.  This paperwork required W.R., A.R.'s mother, to apply as a "sponsor" of A.R.  W.R., as well as her adult family members living in her household, promptly completed and returned 46 pages of paperwork that same day.  The case worker refused to tell her the name or location of the facility where A.R. was held.

**B.     The Government Refuses To Release W.R.'s Son To Her Custody.**

55.     On June 27, 2018, a BCFS case worker called W.R. to conduct a telephone "interview" that she said was required to "sponsor" a child.  W.R. asked a number of questions regarding A.R's well-being and location.  For the first time, the case worker confirmed that A.R. was being held in a BCFS facility in Baytown, Texas.

56.     W.R asked additional questions about A.R., some of which the case worker answered and some of which she refused to answer.  Specifically, W.R. asked for A.R.'s alien registration number, but the case worker refused to provide it.  The case worker then told W.R. that because W.R. had so many questions, she was going to "have to reschedule the interview." W.R. stopped asking questions and asked the case worker to conduct the interview because she did not want to do anything to delay or jeopardize A.R.'s release.  During the interview, the case worker repeatedly referred to W.R. as a "sponsor" and not as A.R.'s mother or parent.

57.     The case worker's very first question to W.R. was whether she is religious, and if so, what religion she practices.  The case worker then asked W.R. whether she was Christian and

attended church and how often.  W.R. replied that she is religious and attends church regularly, the case worker responded "Great!"

58.     The case worker asked additional questions about a variety of topics, including: W.R.'s marital status, and how W.R. intended to "discipline" A.R., where  A.R. would live, how many bedrooms and bathrooms were in the home where A.R. would reside, where A.R. would go to school, how A.R. would get to and from school, whether W.R. knew where the closest hospital or clinic was located, whether A.R. had any health or behavioral problems, and whether A.R. had suffered any trauma or abuse.  W.R. answered all of the case worker's questions without objection because she did not want to jeopardize her reunification with her son, A.R.

59.     The case worker then asked many questions completely unrelated to W.R.'s biological relationship with her son, or her care of her son.  These questions included: what date did W.R. leave Brazil, who planned the trip, how W.R. paid for the trip, what modes of transportation W.R. and A.R. used to travel to the United States, why W.R. and A.R. came to the United States, and whether anyone had ever threatened to report W.R. to the police or to immigration authorities.  Again, W.R. answered all questions without objection, because she feared that any objection would jeopardize or further delay A.R.'s release.

60.     The case worker then told W.R. that ORR's policy now required additional documents to complete the application for her son's release.  Specifically, the amended ORR rules purportedly require W.R. to provide a release form signed by all other adult relatives currently residing with W.R.  In addition, the amended ORR rules purportedly require fingerprints from W.R. and these same relatives.

61.     Finally, the case worker told W.R. that once the fingerprinting was complete, it would take another "3-5 business days," perhaps longer, to get the results of the fingerprint check.

The case worker stated that only after all adults in W.R.'s household "cleared" the fingerprinting process would ORR continue to process and evaluate her "sponsor" application. W.R. has been informed by other government sources that it could take more than 20 days after the fingerprints for a decision to be reached on her "sponsor" application of her son, A.R.

62.     Anxious to obtain A.R.'s release as soon as possible, W.R.'s relatives filled out the additional release forms immediately and returned them to ORR via fax within one hour of the telephone call with the case worker.

63.     Upon hearing how much time the reunification process would take, W.R. was devastated. W.R. had been trying to locate A.R. and obtain his release for nearly a month, and she broke down in tears following the "interview" with the case worker.

64.     Later in the evening on June 27, 2018, W.R. was informed by the case worker that she and her relatives could go to a third-party location for fingerprinting at 10:00 AM the following day. W.R.'s brother took off work in order to attend the appointment in hopes of obtaining the release of A.R.

65.     The morning of June 28, 2018, W.R. and her relatives, accompanied by counsel, arrived at the specified location to have their fingerprints taken. Once there, W.R. learned that the appointment was not for fingerprinting, but was instead a "legal orientation program" for potential "sponsors." W.R. was upset that she could not complete the fingerprinting. She was also concerned that her parental rights were not being recognized and that she was being treated as a stranger to her son. Nonetheless, W.R. attended the orientation program out of fear that her refusal to attend would jeopardize or delay A.R.'s release. The program was held in Spanish, a language that W.R. does not understand.

66.     While at the "orientation" program, W.R. received a call from another BCFS case worker, who informed her that the earliest available date for fingerprinting was July 12, 2018.  The case worker informed W.R. that the only place she could go for fingerprinting was a particular vendor in Worcester, Massachusetts; this vendor is located over 50 miles away from the town where W.R. resides.  W.R. offered to have her and her family's fingerprints taken at the USCIS building near Boston, but she was informed she could not go there.  W.R. has tried unsuccessfully to get an earlier fingerprinting appointment date.

67.     Accordingly, under the government's timeline, W.R. cannot be reunited with her son until, at the earliest, late July 2018—nearly two months since their forcible separation.

68.     W.R. has not seen her son since he was taken from her on May 30, 2018.  She worries about his well-being and safety, and does not know when she will see him again.  She is desperate to be reunited with him.  W.R. considers her separation from A.R. to be the worst experience of her life.

69.     A.R. was terrified and upset by his forcible removal from his mother.  Before fleeing for the U.S., A.R. was physically abused by his father and was traumatized by that event.  Each day that A.R. and W.R. are separated causes A.R. greater harm and leads to further emotional trauma, which could potentially become permanent.  W.R. fears for A.R.'s safety as long as he is detained and separated from her.

70.     The government has no legitimate interest in—or legal basis for—separating W.R. from her son.  There is no evidence, or even allegation, that W.R. is not A.R.'s parent or that W.R. is an unfit parent.  To the contrary, all of the evidence and the efforts undertaken by W.R. demonstrate that she is acting in the best interests of her child.  She should be reunited with her son immediately.

## CAUSES OF ACTION

### Count I

### (Declaratory Judgment Act)

71.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

72.     The federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

73.     There is an actual controversy between the parties because Defendants have refused to immediately release A.R. into his mother's custody.  The Court should exercise its authority under the Declaratory Judgment Act to declare that Defendants have no basis to refuse to release A.R. and to order Defendants to immediately release A.R. into the custody of his mother, W.R.

### COUNT II

### (Petition for Writ of Mandamus)

74.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

75.     Federal district courts have original jurisdiction to hear "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361; *see also Samirah v. Holder*, 627 F.3d 652, 661 (7th Cir. 2010) (remanding case to district court to issue writ of mandamus commanding Attorney General to take necessary steps to enable alien to reenter United States).

76.     Here, as explained above, defendants owe a duty to W.R. and her son to immediately release A.R. into W.R.'s custody. It is therefore appropriate for this court to issue a writ of mandamus commanding the Defendants to immediately release W.R.'s son.

## COUNT III

### (Petition for Writ of Habeas Corpus)

77.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

78.     Plaintiff A.R., as a natural person present in the United States, has a constitutional liberty interest in release from unlawful detention through the writ of habeas corpus.

79.     This Court has jurisdiction to issue a writ of habeas corpus to end the detention of Defendant A.R. because her continued detention violates her legal and constitutional rights as set forth above.

## COUNT IV

### (Violation of Administrative Procedure Act)

80.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

81.     Defendants have violated the APA on two separate grounds, set forth below as Count IV(a) and Count IV(b).

### Count IV(a) – Subjecting W.R. and A.R. To "Unaccompanied Alien Child" Release Procedures

82.     Under the APA, "final agency action for which there is no other adequate remedy in court [is] subject to judicial review." 5 U.S.C. § 704. Upon judicial review, "agency action, findings, and conclusions" shall be "h[e]ld unlawful and set aside" when they are "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

83.     The ORR's decision to apply its policies and procedures for "sponsoring" an "unaccompanied alien child" to the parents who were forcibly separated from their children by the U.S. government are final decisions for purposes of the APA.  Subjecting A.R. and W.R. to procedures intended only for children who enter this country without parents, causes Plaintiffs to suffer consequences that only this Court can rectify.  These decisions and actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law because, among other reasons, they go beyond the ORR's statutory grant of authority provided by congress and do not comply with the ORR's internal procedures.

84.     Plaintiffs respectfully request that this Court enter an order compelling Defendants to immediately release A.R. into the custody of his mother, W.R.

## Count IV(b) - Application of ORR's Rules

85.     ORR is requiring that W.R. satisfy the ORR's rules and procedures for the release of an unaccompanied alien child before the ORR will return A.R. to his mother.  But the ORR rules being applied were never intended to address situations where a child is removed from a parent while that parent remains in the United States pending an asylum hearing.  Accordingly, ORR's decision to apply its rules for the "sponsorship" of  an "unaccompanied alien child" to A.R., who entered the United States with his mother and was forcibly separated from her by the Defendants, violates the APA.

86.     Congress has charged HHS and, by extension, ORR, with "promptly placing" unaccompanied minors in its custody "in the least restrictive setting that is in the best interest of the child[.]"  8 U.S.C. § 1232(c).   In turn, ORR has established rules and procedures (hereafter

"ORR rules") for the purported "Safe and Timely Release process" for "Children Entering the United States Unaccompanied."[1]

87.     Certain ORR rules were amended in June 2018 with a so-called "zero tolerance" policy implemented by the HHS.[2]   These amendments made it more difficult to release "unaccompanied" children by creating a new requirement that both the parent and each adult household member in the home of the "sponsor" be fingerprinted. *See* ORR Rule 2.5.1; 2.6.2.  Under the policy, fingerprints are shared with DHS for immigration checks and criminal checks. *See id.*

88.     Purportedly pursuant to those amended rules, ORR has refused to return A.R. to his mother unless, among other things, W.R., and her two adult family members with whom she lives submit to a fingerprinting process. *See* ORR Rule 2.5.1, 2.6.2.  These procedures are required of W.R. despite the fact that she was already fingerprinted at the border, and the fact that her child was taken from her by the government itself.

89.     Complying with these procedures requires W.R. to wait until July 12, 2018, for the earliest available fingerprint appointment.  Because processing could take additional weeks after the application for "sponsorship" is complete, it is likely the *earliest* that ORR could reunite W.R. with her nine-year-old son is late July 2018.  This would result in a two-month period of forced separation of mother and child.

---

[1] *See* Office of Refugee Resettlement, Children Entering the United States Unaccompanied, Section Two, available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-statesunaccompanied-section-2#2.2.3. "These policies are posted on ORR's website but are not promulgated through any formal agency rule-making process and do not appear to have any binding effect."

[2] HHS's Deputy Secretary's statement from May 28, 2018 announced: "[F]amilies with children that enter into the United States illegally will be separated when the parent is transferred to federal custody for breaking United States law.  If parents do not wish to be separated from their children, they should not violate the laws of the United States[.]"  United States Department Of Health and Human Services, Statement by HHS Deputy Secretary on Unaccompanied Alien Children Program (available at https://www.hhs.gov/about/news/2018/05/28/statement-hhs-deputy-secretary-unaccompanied-alienchildren-program.html).

90.     In light of the ORR's mission to "promptly place" minors into "the least restrictive setting that is in the best interest of the child," as well as the terms of the *Flores* Settlement (*infra*), the ORR's insistence that the A.R. remain separated from his mother while W.R. (and other relatives) complete a month-long fingerprinting and background check process is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

91.     ORR's decision to impose this requirement is a final decision for purposes of the APA. As a result of the ORR's unlawful decision, Plaintiffs suffer consequences that only this Court can rectify.

92.     On June 28, 2018, District Judge Manish S. Shah of the United States District Court for the Northern District of Illinois ordered the immediate release of a minor child forcibly separated from his mother after entering the United States at the southern border.  The Court found that "where the parent's fitness is not disputed, it is reasonably likely that [the child] no longer falls under [the statutory definition of an unaccompanied minor]" and the child's "continued placement with ORR and [the facility holding the child] likely violates the law, and at a minimum likely interferes with familiar integrity without sufficient procedural justification."  The Court continued that "[c]ontinued separation of [the child] … and [mother] irreparably harms them both." *Souza v. Sessions*, 1:18 cv 04412, Order (N.D. Ill., June 28, 2018).

93.     Plaintiffs respectfully request that this Court enter an order compelling Defendants to immediately refrain from imposing the ORR rules and related "sponsorship" policy and procedures on W.R. and immediately release A.R. into her custody and control.

## COUNT V

### (Violation of Substantive and Procedural Due Process)

94.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

95.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to W.R. and her son, A.R.

96.     W.R. and her son, A.R., have a liberty interest under the Due Process Clause in remaining together as a family.

97.     The separation of W.R. from her son, and the Defendants' ongoing failure to reunite them, violates substantive due process because they further no legitimate purpose and no compelling governmental interest.

98.     Moreover, W.R. and her son were denied, and are still being denied, procedural due process.  They were forcibly separated without *any* process, and W.R. has been prevented from reuniting with her son.  ORR's mechanical application of procedures for the sponsorship of unaccompanied minors to the reunification of minor children and their parents who were forcibly separated by the U.S. government is arbitrary and capricious.

99.     On June 6, 2018, District Judge Dana M. Sabraw of the United States District Court for the Southern District of California denied a motion brought by ICE to dismiss similar due process claims brought on behalf of parents who had been forcibly separated from their children. *See Ms. L. V. U.S. Immigration and customs enforcement*, --- F. Supp. 3d ---, 2018 WL 2725736, at *12 (S.D. Cal. June 6, 2018) (describing allegations of "brutal, offensive" governmental conduct that "shocks the conscience" and "violates plaintiffs' constitutional right to family integrity").  For the same reasons identified by Judge Sabraw, the facts alleged above demonstrate that Defendants violated the due process rights of W.R. and her son.

## COUNT VI

### (Violation of the *Flores* Settlement Agreement)

100.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

- 19 -

101.    A.R.'s detention in Baytown, Texas, at a BCFS facility, violates the Settlement Agreement in *Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal) ("*Flores* Settlement" or "Settlement"). The United States Department of Justice entered into the *Flores* Settlement in January 1997 and it continues to be binding upon U.S. Government agencies, including ICE.

102.    The *Flores* Settlement relates to an agreement that sets forth a "nationwide policy for the detention, release, and treatment of minors in the custody of [Immigration and Naturalization Services] INS" which requires INS to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." *See Flores* Settlement at ¶¶ 9-11. A "minor" is "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." *See id.* ¶ 4; *see Flores v. Lynch,* 828 F.3d 898, 905-6 (9th Cir. 2016).

103.    Paragraph 24(B) of the *Flores* Settlement sets forth a minor's right to challenge a determination to place the minor in a particular facility when in government custody. The minor may seek judicial review in "any United States District Court with jurisdiction and venue over the matter to challenge the placement determination." *See Flores* Settlement at ¶ 24(b).

104.    Paragraph 14 of the *Flores* Settlement requires that "[w]here the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay[.]" *See Flores* Settlement at 14. Paragraph 14 sets forth the "order of preference" for the release of a child; release to a parent is preferred. *Id.*

105.    Moreover, the *Flores* Settlement requires INS to "place each detained minor in the ***least restrictive setting*** appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the

immigration courts and to protect the minor's well-being and that of others." *See Flores* Settlement at ¶ 11 (emphasis added).

106.    This action is brought on behalf of A.R., by A.R.'s mother, W.R., to enforce the *Flores* Settlement, to secure A.R.'s release, and to allow the reunification of A.R. and his mother.

107.    Defendants' policies, practices, acts, and omissions with respect to A.R.'s continued detention deprive A.R. and his mother of their rights under the *Flores* Settlement by failing to place A.R. in the least restrictive setting, failing to reunite A.R. with his parent, and failing to effect A.R.s release to his parent when it was possible to do so. *See Flores* Settlement ¶¶ 11, 14, 19.

108.    W.R. has been and continues to be available to provide care and custody for A.R. To date, the government has made no attempts to reunite A.R. and his mother.

109.    The forcible separation of A.R. From his mother is an intentional interference with parental rights. *See Flores* Settlement at ¶ 24.  State laws provide substantive and procedural protections of the rights of parents to care for their children, and of children to be with their parents, such that children may only be separated from their parents as a matter of last resort.

110.    The *Flores* Settlement permits a child to contest the placement decision of defendants. A.R., by and through his mother, asserts this right and alleges that his placement thousands of miles away from his accompanying parent is improper. *Flores* Settlement at ¶ 24.

111.    As a proximate result of Defendants' policies, practices, acts, and omissions, A.R. has suffered and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury.  The injunctive relief sought by A.R. is necessary to prevent continued and further injury.

## COUNT VII

### (Violation of the Fifth Amendment's Equal Protection Guarantee)

112.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

113.    The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin.

114.    Defendants' decisions to separate families from Central and South America arriving at the southern border seeking asylum, and to isolate children in detention facilities separate from their parents, are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, and/or national origin. This intentional discrimination includes bias against immigrants perceived to come from Central or South American countries.

115.    As a result of these decisions, including the decisions that have caused their separation, W.R. and A.R. have been and are being denied equal protection.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter a judgment against Defendants and award the following relief:

A.    Declare that Defendants have no basis to hold or maintain custody over A.R.;

B.    Declare that Defendants must immediately release A.R. into the custody of his mother, W.R.;

C.    Hold that Defendants violated the due process rights of W.R. and A.R.;

D.      Issue a writ of mandamus requiring that Defendants immediately release A.R. into the custody of his mother, W.R.;

E.      Issue a writ of Habeas Corpus requiring Defendants to release A.R. immediately;

F.      Hold that Defendants violated the Administrative Procedure Act;

G.      Hold that Defendants violated the *Flores* Settlement Agreement;

H.      Hold that Defendants violated the Fifth Amendment's Equal Protection Clause;

I.      Preliminarily and permanently enjoin Defendants from continuing to separate W.R. from her minor son, A.R.;

J.      Enjoin Defendants from removing W.R. from the country until she is reunited with her minor son, A.R.;

K.      Damages in an amount to be determined at trial;

L.      Require Defendants to pay Plaintiffs' reasonable attorneys' fees and costs; and

M.      Order all relief that is just and proper.

Dated: June 29, 2018

Respectfully submitted,

Plaintiffs W.R. and her son, A.R., by and through his mother, W.R.,

By their attorneys,

*/s/ Lucy Heenan Ewins*
Vinita Ferrera (BBO 631190)
Lisa J. Pirozzolo (BBO 561922)
Lucy Heenan Ewins (BBO 682794)
Jocelyn M. Keider (BBO 694801)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
Vinita.Ferrera@wilmerhale.com
LucyHeenan.Ewins@wilmerhale.com
Jocelyn.Keider@wilmerhale.com

*Of Counsel:*
Ivan Espinoza-Madrigal (pro hac vice pending)
Oren Sellstrom (BBO 569045)
Oren Nimni (BBO 691821)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND ECONOMIC JUSTICE
61 Batterymarch 5th Floor
Boston MA 02110
Tel: (617) 988-0624
Fax: (617) 482-4392
iespinoza@lawyerscom.org
osellstrom@lawyerscom.org
onimni@lawyerscom.org