**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| W.R. and her son, A.R., by and through his mother, W.R.; | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States; | ) ) | Civil Action No. 18-cv-11380 |
| U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); KIRSTJEN NIELSEN, Secretary of DHS; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); THOMAS HOMAN, Acting Director of ICE; PATRICK CONTRERAS, Director, ICE Field Office for Enforcement Removal Operations in Houston, Texas; U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); KEVIN K. MCALEENAN, Acting Commissioner of CBP; U.S. CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS"); L. FRANCIS CISSNA, Director of USCIS; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"); ALEX AZAR, Secretary of the Department of Health and Human Services; OFFICE OF REFUGEE RESETTLEMENT ("ORR"); SCOTT LLOYD, Director of the Office of Refugee Resettlement; BCFS; KEVIN DINNIN, President and CEO of BCFS; and PEDRO MARTINEZ, Administrator on Duty BCFS Baytown. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Leave Granted to file on July 11, 2018**<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Defendants. | ) ) ) ) ) ) ) | |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

W.R. has been forcibly separated from her nine-year-old son, A.R., for 41 days. Every additional day that Defendants continue to keep them apart causes them both further irreparable harm. Of particular concern is the toll that continued separation is likely to have on the physical and mental health of A.R., a concern that is supported by the research and experience of countless experts in the fields of pediatrics, child psychology, social work, and trauma research.

As described more fully in Plaintiffs' opening motion, the Defendants' continued separation of this mother and child is completely unjustified, particularly in light of the fact that W.R. has been released from the Government's custody for more than two weeks.[1] Defendants have not disputed that W.R. is A.R.'s mother, nor have they challenged her fitness to care for him. W.R. has complied with every step required of her by the Government, but the Government keeps changing the goal posts. While the clock keeps ticking, this family continues to suffer. The constitutional interests of liberty and family integrity demand immediate action. Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm, and that the balance of hardships and the public interest weighs decidedly in favor of granting relief so that W.R. and A.R. may be reunited as soon as possible. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).

A preliminary injunction is precisely the type of equitable relief necessary for the situation at hand.

---

[1] Defendants assert that W.R. is subject to "expedited removal." Opp. at 3. This is incorrect. W.R. was released on bond and awaits a "master calendar hearing" before an immigration judge in Boston, before whom she will pursue her asylum claims.

## I.     THE INJUNCTION ISSUED IN *MS. L.* DOES NOT NEGATE THE NEED FOR THIS COURT'S INTERVENTION

As an initial matter, Defendants argue that this Court should not grant relief to Plaintiffs because Plaintiff W.R. falls within the class certified in *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428 (S.D. Cal.) ("*Ms. L*"), wherein a federal court has ordered the Government to release children under five to their parents/guardians by July 10, 2018, and older children by July 26, 2018.  *See* Order Granting Plaintiffs' Motion for Classwide Preliminary Injunction, *Ms. L.* (Dkt. No. 83) ("*Ms. L* Order") (attached hereto as Exhibit B).  According to Defendants, as a result of this order, W.R. has already been granted the relief she seeks from this Court.  United States of America's Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp.") at 14 (Dkt. No. 14).  This is not correct.  The relief that W.R. seeks here is not reunification with her minor son, A.R., at some distant future date, but immediate reunification.  And as the Government's recent filings in the *Ms. L* case and its conduct towards W.R. and A.R. demonstrate, that is relief that can only be granted by this Court.

Defendants' brief fails to mention that, on July 5, 2018, the Government requested relief from the *Ms. L.* order, raising a host of administrative hurdles and acknowledging that it will be unable to meet the court-ordered deadlines for reunification.  *See id.*; Respondents' Notice Regarding Compliance and Request for Clarification and/or Relief, *Ms. L* (Dkt. No. 86) at 8 ("HHS anticipates, however, in some instances it will not be able to complete the additional processes within the timelines the Court prescribed, particularly with regard to class members who are already not in Government custody (*e.g.*, because they have previously been paroled or released).").  The Government has offered no commitment as to when it will comply with the order, particularly in the case of parents such as W.R. who are not in Government custody.

Moreover, the facts of this case strongly suggest that, absent relief from this Court, the Government will not meet even the July 26th deadline supposedly applicable to A.R.  On July 5, 2018, one of the case workers at the BCFS facility where A.R. is being held told W.R. for the first time that she must undergo a "home study" before ORR will render a decision in her case. Supplemental Affidavit of W.R. in Support of Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. No. 17-1) ("W.R. Supp. Aff.") ¶¶ 9-11.  The case worker would only estimate that the home study would occur *sometime during the next 15 days*, and that it would take at least *ten additional days* after the study for ORR to reach a decision about reunification, let alone for W.R. and A.R. to be actually reunified.  *Id*.

Thus, without relief from this Court, the earliest that W.R. and A.R. are likely to be reunited is August 2018, more than two months after the Government wrongfully separated them.  And that is only if there are not further delays of the type that the Government is seeking in the *Ms. L.* litigation, or further roadblocks of the type that the Government continues to erect in W.R. and A.R.'s specific case.  In short, though the Government represents that reunification of this mother and child is "underway," Opp. at 12, it has made no commitments to reunify W.R. and A.R.  Indeed, W.R. does not even have agreement from Defendants that her "sponsor" application will be granted or that her child will be returned at all, let alone a date for A.R.'s release.  The Court's involvement is necessary to effectuate the prompt reunification of mother and son and to prevent additional irreparable harm.

W.R. and A.R. have already been separated for 41 days.  Requiring them to wait weeks or even months more, with no clear commitment from Defendants as to whether or when they will be reunited, is utterly unreasonable and, as set forth more fully below and in the accompanying declarations, is likely to inflict significant harm on A.R. who was vulnerable to

sustained trauma even before the Defendants' wrongful actions.  R. will also continue to sustain

irreparable harm from being separated from her young son.  This harm far outweighs the

"negligible" harm to Defendants in "managing the response to ongoing class litigation . . ."

Preliminary Injunction Order, *Souza v. Sessions*, Case No. 18-cv-04412 (N.D. Ill.) (Dkt. No. 23)

(*Souza* Order) at 3 (attached hereto as Exhibit C).

       Nor would an order from this Court interfere in any way with the administration of class

relief in *Ms. L.*, nor create the risk of conflicting orders.  The *Ms. L.* Order may set outer bounds

for when families must be reunited (and even those outer bounds may be shifting), but it

certainly does not prohibit earlier reunification.  An order from this Court directing Defendants

to immediately reunite mother and son would therefore be fully in accord with the relief ordered

in *Ms. L.  See also* Memorandum Opinion and Order, *W.S.R. and C.D.A. v. Sessions*, Case Nos.

18 C 04265 and 18 C 04291 (N.D. Ill.) ("*W.S.R.* Order") (noting that any hardship that

"accelerated reunification" causes the Government is "self-inflicted," and that "the balance of

equities" favored immediate reunification notwithstanding the order in *Ms. L.*) (attached hereto

as Exhibit D).

    **II.**    **ISSUANCE OF A PRELIMINARY INJUNCTION IS APPROPRIATE AND**
               **SUPPORTED BY PRECEDENT**

There can be little doubt that the forced separation of a mother and child, and continued

detention of a nine-year old boy, runs afoul of any notion of due process, and that the resulting

harm to W.R. and A.R. far outweighs any purported hardship or public interest claim that the

Defendants attempt to assert.  Two district courts that have considered factually comparable

cases with similar legal claims have already found that similarly-situated Plaintiffs satisfied the

requirements for preliminary injunctions by demonstrating a likelihood of success on the merits,

and of irreparable harm in the absence of an injunction, and that, the balance of hardships and the

public interest weighed in favor of granting the preliminary injunction.  *See Ms. L* Order; *Souza*

Order (ordering **immediate** release of child to mother's custody); Preliminary Injunction Order,

*Paixao v. Sessions*, Case No. 18-cv-04591 (N.D. Ill.) (Dkt. No. 16) ("*Paixao* Order") (same)

(attached hereto as Exhibit E); *W.S.R.* Order (ordering reunification of children with parents

within 72 hours).  Defendants have articulated no reasoned basis for reaching a different result

here.

### A.  This Court Has Jurisdiction to Hear Plaintiffs' Claims and to Grant the Equitable Relief Requested

Defendants' opposition to Plaintiffs' motion for a preliminary injunction asks this court

to avoid the merits of Plaintiffs' motion—and the inevitable conclusion that the separation of

W.R. and A.R. (and the failure to promptly reunite them) is unlawful—and instead hold that the

Court does not have jurisdiction over Plaintiffs' claims.  But Defendants' myriad jurisdiction

arguments all fail.

Defendants' argument that sovereign immunity deprives this Court of jurisdiction is

incorrect.  The United States has consented to a suit for declaratory relief in this case pursuant to

Section 702 of the Administrative Procedure Act, which states in relevant part:

> A person suffering legal wrong because of agency action, or adversely affected or
> aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial
> review thereof.  An action in a court of the United States seeking relief other than money
> damages and stating a claim that an agency or an officer or employee thereof acted or
> failed to act in an official capacity or under color of legal authority shall not be dismissed
> nor relief therein be denied on the ground that it is against the United States or that the
> United States is an indispensable party.

*See* 5 U.S.C. § 702; *W.S.R.* Order ("[B]ecause Plaintiffs seek only injunctive relief against

federal agencies on the reunification claim, sovereign immunity is waived via the Administrative

Procedure Act, 5 U.S.C. § 702.").  The First Circuit has interpreted this language as a waiver "for

all equitable actions for specific relief against a Federal agency or officer acting in an official

capacity." *Puerto Rico v. United States*, 490 F.3d 50, 57-58 (1st Cir. 2007) (quoting *Trudeau v.*

*Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006)); *see also Match-E-Be-Nash-She-Wish*

*Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) ("The APA generally waives

the Federal Government's immunity from a suit 'seeking relief other than money damages and

stating a claim that an agency or an officer or employee thereof acted or failed to act in an

official capacity or under color of legal authority.'") (quoting 5 U.S.C. § 702).  Importantly,

because Section 702 provides a waiver of sovereign immunity for "*all* equitable actions for

specific relief against a federal agency or officer acting in an official capacity" it applies to all of

Plaintiffs' claims whether brought "under the APA or not."  *Puerto Rico*, 490 F.3d at 58 (quoting

*Trudeau*, 456 F.3d at 186 (emphasis in original)); *see also Com. of Mass. by Dep't of Pub.*

*Welfare v. Departmental Grant Appeals Bd. of U.S. Dep't of Health & Human Servs.*, 815 F.2d

778, 781 (1st Cir. 1987) ("Section 702, not itself an independent source of jurisdiction, waived

the defense of sovereign immunity for claims arising under § 1331 not involving monetary

relief."); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he

waiver in § 702 is not limited to claims brought pursuant to the review provisions contained in

the APA itself. The waiver applies when any federal statute authorizes review of agency action,

as well as in cases involving constitutional challenges and other claims arising under federal

law.").

Defendants also assert that this Court lacks jurisdiction to issue a writ of habeas corpus

because of A.R.'s continued detention in Texas.  Opp. at 16-17.  The relevant question, however,

is not where A.R. is located, but whether this Court has jurisdiction over the individual with

"custody and control" over A.R.  "The writ of habeas corpus does not act upon the prisoner who

seeks relief, but upon the person who holds him in what is alleged to be unlawful custody."

*Braden v. 30th Judicial Circuit Court,* 410 U.S. 484 494-95 (1973).  Notably, the Defendants fail

to identify the custodian to whom they believe a habeas claim is properly directed.  However, to

the extent that a custodian is identified, Defendants' clear contention is that A.R.'s custodian is

ORR: "A.R. is a 9-year old boy, who is currently in the care and custody of ORR."  Opp. At 9.

BCFS Baytown, located in Baytown, Texas is a shelter facility providing care for detained

children "in ORR care and custody."  De La Cruz Decl. ¶ 3.  Plaintiffs' habeas claim is

appropriately directed to Scott Lloyd, Director of ORR—the entity that has taken responsibility

for the custody of A.R.[2]

Furthermore, "the First Circuit has opined that 'there may be extraordinary circumstances

in which the Attorney General appropriately might be named as the respondent to an alien

habeas petition.'"  *Pen v. Sessions*, No. CV 17-10626-NMG, 2017 WL 2312822, at *1 (D. Mass.

May 25, 2017), citing *Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir. 2000).[3]  This Complaint

involves such extraordinary circumstances which make it appropriate for this Court to entertain

Plaintiffs' habeas claim.  A.R. and W.R. were initially detained in Arizona.  Affidavit of W.R. in

Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction

(Dkt. No. 7) ("W.R. Aff.") ¶ 16.  After A.R. and W.R. were forcibly separated, W.R. was

released from custody and now resides in Massachusetts.  *Id.* at ¶ 38.  A.R. was spirited across

state lines to a facility in Baytown, Texas, without W.R.'s consent and, in fact, over her

objection.  *Id.* at ¶¶ 18, 23-25.  W.R. was repeatedly refused information regarding his

whereabouts and did not learn where A.R. was being held after she had already relocated to

---

[2] Indeed, the Defendants have asserted that they—not third-party government contractors such as BCFS—are responsible for reuniting separated immigrant families pursuant to *Ms. L.* Opp. at 19.
[3] Further, in *Rumsfeld v. Padilla*, the Court explicitly declined to resolve the question of whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation.  542 U.S. 426, 436 n. 8. (2004) ("In *Ahrens v. Clark*, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), we left open the question whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation…Because the issue is not before us today, we again decline to resolve it.").

Massachusetts. *Id*. at ¶¶ 26, 28-29, 32-34, 39, 43. In fact, Defendants demonstrated no intention

of confirming A.R.'s location until counsel became involved. *Id*. at ¶ 43. The instant case, in

which a minor was forcibly removed from the custody of his parent, a resident of Massachusetts,

without constitutionally justifiable process or reason, presents the type of extraordinary facts

contemplated by the First Circuit in *Vasquez*. *See Vasquez*, 233 F.3d at 696 (extraordinary

circumstances might arise where the Government has "spirited an alien from one site to another,"

or other facts of the case suggest "furtiveness" regarding the plaintiff's location.).

Lastly, Defendants inexplicably assert that this court lacks jurisdiction over its claims

under the *Flores* Settlement Agreement ("the Agreement"), stating "the enforcement of all

provisions of the [*Flores*] Agreement, ***other than those brought under Paragraph 24***, should be

brought in the U.S. District Court for the Central District of California." Opp. at 19 (emphasis

added). Defendants miss the point entirely: Plaintiffs did bring their claim under Paragraph 24—

A.R., through his mother, has asserted his right to challenge the government's actions pursuant to

Paragraph 24(b), Compl. ¶ 103—and therefore, as Defendants concede, jurisdiction is proper.

## B. Plaintiffs are Likely to Succeed on the Merits of Their Claims

Failing relief on jurisdiction grounds, Defendants wrongly claim that Plaintiffs are not

likely to succeed on their constitutional claims. But Plaintiffs are likely to prevail because they

have identified a protected liberty or property interest; have shown that Defendants have

deprived them of that interest without constitutionally adequate process (procedural due

process); and have further shown that Defendants' actions have been "so egregious as to shock

the conscience," (substantive due process). *Doe v. Devonshire*, 181 F. Supp. 3d 146, 151-52,

154 (D. Mass. 2016), citing *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 639 (1st Cir.

2013), *Gonzalez–Droz v. Gonzalez–Colon*, 660 F.3d 1, 13 (1st Cir. 2011). The interests in this

case, namely A.R.'s liberty and W.R.'s fundamental liberty interest in the care and custody of

her child, are of the highest order, and it is well-settled that such interests are constitutionally

protected.  *See Lassiter v. Dept. of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 25, 27 (1981);

*Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000)

(plurality opinion).  District courts have held that due process claims arising from similar facts

are likely to succeed.  *See, e.g.*, *Ms. L.* Order; *Souza* Order; *Paixao* Order.

On June 26, 2018, Judge Dana Sabraw held that the practice of separating immigrant

families and failing to reunify them, without any showing that the parent is unfit or presents a

danger to the child, was sufficient to find a likelihood of success on due process claims.  *Ms. L*

Order at 3, 17.  Judge Sabraw noted that the practice of separating children from their parents

absent a showing that the parent is "unfit or presents a danger to the child," and without any

"effective procedures or protocols for notifying the parents about their children's whereabouts or

ensuring communication between the parents and children, and the use of the children as tools in

the parents' criminal and immigration proceedings" constitutes a practice "so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience . . . interferes with

rights 'implicit in the concept of ordered liberty . . .' and is so 'brutal' and 'offensive' that it does

not comport with traditional ideas of fair play and decency." *Id.* at 17 (internal citations omitted).

Similarly, on June 28, 2018, Judge Manish Shah ordered the ***immediate*** release of a nine-year-

old Brazilian boy in ORR custody, finding that "[The mother] is present and available. *Souza*

Order at 2.  "The Office of Refugee Resettlement has no statutory basis to keep [the child] in

custody if he is not an unaccompanied alien child . . . His continued placement within ORR and

[the third-party shelter] likely violates the law, and at a minimum, likely interferes with familial

integrity without sufficient procedural justification." *Id.* at 2-3.  On July 5, 2018, Judge Shah

reached the same result with respect to another minor child who crossed the southern border only to be separated from his mother by the Government, and on July 9, 2018, Judge Chang reached the same result in the cases of two minor children separated from their fathers by the Government. *See Paixao* Order; *W.S.R.* Order.

Here, W.R.'s young son was torn from her arms, detained, crying, in a "cage" across the room from W.R., and subsequently transferred across state lines over his mother's objection. W.R. Aff. ¶¶ 18, 20-21, 23-25. Officials refused to provide W.R. with information regarding her son's well-being and whereabouts for weeks, only confirming his location after counsel intervened. *Id.* ¶¶ 26, 28-29, 32-34, 39, 43. A.R. has reported to his mother that he is hungry, unable to communicate with others at his shelter, and "cannot take it anymore." W.R. Supp. Aff. ¶ 4. Despite her efforts to comply with each of the Government's requests as quickly as possible, Defendants continue to impose new and burdensome requirements on W.R., further prolonging the separation of mother and child. *Id.* ¶¶ 9-11. Defendants failed to accord W.R. and A.R. *any* notice or opportunity to be heard regarding either their initial separation, or their continued separation, which is now in its second month. Defendants' actions throughout W.R.'s ordeal, including the decision to prolong this unlawful separation by forcing W.R. to submit to ORR's "sponsorship" process—which was never intended to apply in this context—have been "truly outrageous, uncivilized, and intolerable." *See Ms. L.* Order at 7 ("[ORR] was not initially designed to address the problem of migrant children detained with their parents at the border and

who were thereafter separated from their parents."). These actions are enough to shock, and

indeed have shocked, the American conscience. [45]

## C. Plaintiffs Have Suffered, and Will Continue to Suffer, Severe Irreparable Harm Absent Emergency Relief, Which Can Be Granted Without Harm to Defendants

Defendants' Opposition utterly fails to address the severe irreparable harm being suffered

by W.R. and A.R. In particular, their hearsay assertion that A.R. "has not demonstrated any

mental health concerns as a result of being separated from his mother," De La Cruz Decl. ¶ 7

(Dkt. No. 18-1), reflects a profound and willful ignorance of the harms that arise from

involuntary and unwanted family separation.

As an initial matter, this assertion runs directly contrary to W.R.'s personal observations

during the few brief conversations she has been permitted to have with A.R. as well as the

opinions of numerous experts in the field of children's physical and mental health. For instance,

while Defendants assert that A.R. "reportedly has normal sleep and eating patterns" and "is able

---

[4] Countless news outlets have noted widespread national and international condemnation of the practice of separating families at the border. *See, e.g.*, Natasha Bach, *Melania Trump Says She "Hates to See" Family Border Separation in Rare Policy Statement*, FORTUNE (June 18, 2018), http://fortune.com/2018/06/18/melania-trump-family-border-separation/ ("Democrats, for their part, have widely criticized the policy, calling it cruel and disgraceful. A growing number of Republicans have added their voice to the condemnation in recent weeks, including a variety of prominent lawmakers, former First lady Laura Bush, a conservative newspaper, and a former advisor to Trump."); Peter Baker, *Bipartisan Cry Over Families Split at Border*, N.Y. TIMES, June 18, 2018, at A1 ("The administration approach has drawn a cascade of criticism in recent days."); Ellen Knickmeyer, *Protestors flood US cities to fight Trump immigration policy*, ABC NEWS (July 1, 2018), https://abcnews.go.com/Politics/wireStory/care-protesters-family-separations-flood-us-cities-56286006 ("Protesters flooded more than 700 marches, from immigrant-friendly cities like New York and Los Angeles to conservative Appalachia and Wyoming...'If we can't come together under the idea of 'Kids shouldn't be taken from their parents,' where are we?'"); Adam Samson and Mark Odell, *UN urges US to end separation of migrant children 'immediately'*, FINANCIAL TIMES, June 18, 2018, accessed via LexisNexis News ("The thought that any state would seek to deter parents by inflicting such abuse on children is unconscionable. I call on the United States to immediately end the practice of forcible separation of these children."); Will Weissert and Lisa Mascaro, *Ground Game: Will family separation outcry hurt Texas GOP?*, N.Y. TIMES (June 28, 2018), https://www.nytimes.com/aponline/2018/06/28/us/ap-us-ground-game-texas-.html ("But sounds of wailing toddlers separated from their parents and images of children held alone behind metal caging proved too much for Cruz and many in his party…If Congress fails to reach an agreement, though, the backlash could hurt both parties as the chaos both sides claim to oppose continues on the border.").

[5] Defendants' further contention—made in a single sentence with no support—that Plaintiffs "fail to state a claim" under the *Flores* Agreement, Opp. at 19, is also wrong. Plaintiffs set forth detailed claims describing how the separation of A.R. and W.R. violates that Agreement, Compl. ¶¶ 100-11, and Defendants make no showing at all that these allegations are insufficiently pled. Indeed, as Plaintiffs showed in their opening brief, Plaintiffs have demonstrated a likelihood of success on this claim.

to understand and communicate appropriately in Spanish," *Id.*  ¶¶ 7-9, A.R. reported to W.R.

during a telephone conversation on July 2, 2018, that he was hungry and distressed, that he had

no one with whom to speak his native language (Portuguese), and he begged W.R. "Mamaezinha

[Mommy] please come get me," repeatedly crying that he "cannot take it any longer."  W.R.

Supp. Aff. ¶ 4.

Moreover, as set forth in the accompanying declarations from numerous experts in the

fields of pediatrics, child psychiatry, clinical social work, the treatment of trauma, and

linguistics, Defendants' suggestion that A.R. is not being harmed by being forcibly separated

from his mother and detained in unfamiliar surroundings flies in the face not only of

commonsense but of decades of scientific research.  *See, e.g.*, Beresin Decl. ¶ 14 (attached hereto

as Exhibit F); Danaher Decl. ¶¶ 9-16, 18 (attached hereto as Exhibit G); Sagor Decl. ¶ 7-8

(attached hereto as Exhibit H); Scobie-Carroll Decl. ¶ 6, 8-10 (attached hereto as Exhibit I).  In

fact, research and clinical experience have shown repeatedly that "children who are forcibly

separated from their parents experience an acute traumatic event" which places them at high risk

for severe consequences to their mental and physical health that can persist into adulthood.

Beresin Decl. ¶¶ 7-9; Danaher Decl. ¶ 11; Sagor ¶ 7-8; Scobie-Carroll Decl. ¶ 7.  Such

consequences include:

- **Toxic Stress** – a condition triggered by traumatic events such as forced
  separation, which can impact a child's brain functioning and "lead to difficulties
  with mood control, memory, and appropriate decision-making," and place the
  child at increased risk of "adverse health outcomes into adulthood such as cancer,
  stroke, diabetes, and heart disease."  Danaher Decl. ¶¶ 11-15.

- **Post-Traumatic Stress Disorder (PTSD)** – a disorder characterized by "flashbacks and nightmares of the traumatic situation; emotional numbing and social isolation; and episodes of autonomic arousal ('fight or flight' reaction)." Beresin Decl. ¶ 8.

- **Psychosocial Dysfunction** – including impaired relationships, distrust of authority figures, and separation anxiety. *Id*. ¶ 9.

- **Mood Disorders** – including anxiety, depression, a sense of blame, unworthiness or guilt. Danaher Decl. ¶16; Beresin Decl. ¶¶ 10-11.

- **Physical Health Problems** – including "headaches, muscle aches, diminished appetite or abdominal pain." Danaher Decl. ¶16

All of these are consequences that can last a lifetime. Beresin ¶¶ 8-12; Danaher Decl. ¶¶ 12-16; Sagor Decl. ¶¶ 6-7. Moreover, they are harms that grow increasingly likely with each day that A.R. is kept from his mother. Beresin Decl. ¶¶ 17 ("The longer a child is in a traumatic situation, the greater the likelihood of significant harm.").

The harm that is occurring from A.R.'s continued detention is amplified by the fact that he speaks only Portuguese and knows neither English nor Spanish. W.R. Supp. Aff. ¶4; Beresin Decl. ¶ 15. The Government's attempt to downplay this language barrier borders on preposterous. *See, e.g.*, De La Cruz Decl. ¶ 9 (hearsay assertion that A.R. is "reportedly enjoying learning more Spanish" while being forcibly detained apart from his mother). The notion that A.R. is somehow able to meaningfully communicate in Spanish, a language he does not know, enough to communicate with his government-provided mental health provider in Spanish, *id*. ¶ 9, is simply not credible. Even putting aside the fact that A.R. is only nine-years-old, Spanish and Portuguese are different languages. They "have different grammars (*e.g.* sentence structure,

morphology, and phonology) and different lexicons."  Hackl Decl. ¶¶ 6-7 (attached hereto as

Exhibit J).  A.R. has expressed the distress and isolation he feels to his mother due to his

inability to communicate explaining "that he has no friends there and that there is no one who

speaks his language (Portuguese)."  W.R. Supp. Aff. ¶ 4.

Given the opinions of medical and mental health professionals and the increasing

suffering of both W.R. and A.R., it is clear that, despite the Government's wishful assertions,

their forced separation has caused and continues to cause irreparable harm.

In light of these circumstances, it is not surprising that Courts that have had occasion to

consider the Government's separation of migrant families have had no trouble concluding that

the plaintiffs in those cases demonstrated irreparable harm, and that the balance of harms

weighed in favor of granting a preliminary injunction.  *See Ms. L.* Order at 18 -20 (recognizing

that separations "have been agonizing for the parents who have endured them" and noting

"ample evidence" from *amici* that forced separation leads to "serious, negative consequences to

children's health and development."); *Souza* Order at 3 ("Continued separation…irreparably

harms them both. Money damages cannot repair the harm to familial integrity."); *W.S.R.* Order at

16 ("Common sense would tell anyone that keeping these boys separated from the only family

they have in the United States—in a facility where they have limited access to talk to their

[parents] and where very few people speak their language—is causing irreparable harm, for

which no other form of relief, monetary or otherwise, would be adequate.").

### D.  The Balance of Equities Weighs Decidedly in Favor of Granting W.R. and A.R. Injunctive Relief So They May Be Reunited Immediately

W.R. is A.R.'s mother.  She is available and able to care for him.  Defendants do not

dispute either of these facts.  The harms to both W.R. and A.R. from Defendants' conduct are

extraordinary, and the risk of permanent psychological harm compounds day by day.

Defendants note that A.R. was abused by his father in Brazil—a fact freely disclosed by both A.R. and W.R.—and now cite this as the reason for a newly-imposed requirement of a "home study." Opp. at 12; W.R. Supp. Aff. ¶ 10. If anything, this fact strengthens the need for immediate reunification. A.R. has already faced abuse from his father, and now the Government has removed from him the one non-abusive parent he has and is refusing to immediately reunify them. This exacerbates the already severe harm of family separation. *See* Beresin Decl. ¶ 10 (noting that where a child has been abused by a father, the mother is placed "in a unique situation to modulate experience and provide comfort and psychological stability. If that one person is stripped from the child, serious adverse consequences are even more likely.").

While the TVPRA requires a home study where "the child has been a victim of physical or sexual abuse *under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened*," *see* ORR Guide, Section 2.4.2 (emphasis added), Defendants' attempt to apply this requirement under the circumstances present here is yet another example of the misapplication of a statutory provision that is directed to a different context and purpose. Applying this requirement of a home study against a fit parent that has fled abuse in order to protect her child's health and welfare undermines the statute's very purpose of ensuring that the placement of the child is safe and appropriate. The record reflects that W.R. used all of her resources to travel to the U.S. *in order to protect A.R.* from abuse and other circumstances that threatened his safety. W.R. Aff. ¶¶ 4-7, 11. W.R.'s actions while in detention and following her release demonstrate extensive concern for A.R.'s welfare, and W.R. has gone to great lengths to comply with every government requirement in order to secure A.R.'s release as soon as possible. *See generally*, W.R. Aff., W.R. Supp. Aff. ORR's application of this additional home study requirement to W.R. is onerous, arbitrary, and unjustified in light of

the evidence.  Imposing additional process requirements on W.R. "only serves to interfere in the family's integrity with little to no benefit to the government's interests." *See Souza* Order at 2. As in the case of Ms. Souza, "the harm to the defendants in immediately placing [child] with [mother] is negligible," and "[t]he government's interests in completing certain procedures to be sure that [child] is placed in a safe environment and in managing the response to ongoing class litigation do not outweigh the family's interest in reuniting." *Id*. at 3.

The forced separation of W.R. and A.R. has gone on for far too long.  Each day that it continues the Plaintiffs suffer agonizing and irreparable harm.  The court should grant the preliminary injunction and reunite W.R. and A.R. as soon as possible.

Dated: July 11, 2018

Respectfully submitted,

Plaintiffs W.R. and her son, A.R., by and
through his mother, W.R.,

By their attorneys,

*/s/ Lucy Heenan Ewins*
Vinita Ferrera (BBO 631190)
Lisa J. Pirozzolo (BBO 561922)
Lucy Heenan Ewins (BBO 682794)
Jocelyn M. Keider (BBO 694801)
WILMER CUTLER PICKERING HALE AND DORR
LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
Vinita.Ferrera@wilmerhale.com
Lisa.Pirozzolo@wilmerhale.com
LucyHeenan.Ewins@wilmerhale.com
Jocelyn.Keider@wilmerhale.com

*Of Counsel:*
Ivan Espinoza-Madrigal (pro hac vice)
Oren Sellstrom (BBO 569045)
Oren Nimni (BBO 691821)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND
ECONOMIC JUSTICE
61 Batterymarch 5th Floor
Boston MA 02110
Tel: (617) 988-0624
Fax: (617) 482-4392
iespinoza@lawyerscom.org
osellstrom@lawyerscom.org
onimni@lawyerscom.org

## <u>LOCAL RULE 7.1 CERTIFICATION</u>

Pursuant to Local Rule 7.1(a)(2), and Federal Rule of Civil Procedure 37(a), the parties met and conferred in a good faith effort to resolve or narrow the issues presented by this motion. Defendants do not oppose this motion.

*/s/ Lucy Heenan Ewins*
Lucy Heenan Ewins

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document, filed through the ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing on July 11, 2018.

*/s/ Lucy Heenan Ewins*
Lucy Heenan Ewins
